1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALEJANDRO ARCEO,                           No.  2:20-cv-02334-DAD-DB

12                   Plaintiff,

13        v.                                     ORDER DENYING DEFENDANTS SUTTER
                                                 ROSEVILLE MEDICAL CENTER AND
14   CITY OF ROSEVILLE, et al.,                  SUTTER HEALTH'S MOTION FOR
                                                 SUMMARY JUDGMENT
15                   Defendants.
                                                 (Doc. No. 68)
16

17          This matter is before the court on the motion for summary judgment filed on behalf of

18   defendants Sutter Roseville Medical Center ("SRMC") and Sutter Health (collectively, "moving

19   defendants") on May 24, 2022.  (Doc. No. 68.)  That motion was taken under submission without

20   oral argument by the previously assigned district judge on August 16, 2022.[1]  (Doc. No. 88.)  For

21   the reasons explained below, the pending motion for summary judgment will be denied.

22                                          **BACKGROUND**

23          This case arises from defendants' alleged failure to provide medical care for plaintiff

24   Alejandro Arceo while he was suffering a psychiatric episode, which failure allegedly led him to

25   pull out his own eye while detained in a Placer County jail.  (Doc. No. 51.)

26

27   _____
     [1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 95.)  The
28   undersigned has endeavored to work through a backlog of inherited submitted motions in civil
     cases as quickly as possible since returning to the Sacramento courthouse one year ago.

                                                  1

1     **A.     Factual Background**[2]

2            During the week of November 18, 2019, plaintiff began experiencing paranoia and

3     making nonsensical comments despite having no prior history of mental illness.  (PDF ¶¶ 1–3.)

4     On Friday, November 22, 2019, plaintiff boarded a train from San Jose State University with

5     intentions to travel to Roseville.  (PDF ¶ 4.)  However, he disembarked in Richmond, California

6     to seek help for his paranoia.  (PDF ¶ 5.)  In Richmond, plaintiff approached police officers,

7     requesting they escort him to a hospital because he felt scared and uneasy.  (PDF ¶ 6.)  The

8     officers could not escort him to the hospital but called an ambulance for plaintiff instead, which

9     drove him to a Kaiser hospital in Richmond ("Kaiser Richmond").  (PDF ¶¶ 7–8.)  Plaintiff's

10    mother met him at Kaiser Richmond.  (PDF ¶ 9.)  A physician at that hospital prescribed plaintiff

11    Risperidone, a psychotropic medication used to treat schizophrenia and psychosis, calm agitated

12    patients, and reduce paranoid thoughts and auditory hallucinations.  (PDF ¶¶ 10, 97.)  Kaiser

13    Richmond recommended that plaintiff go to the mental health clinic at a Kaiser hospital in

14    Sacramento ("Kaiser Sacramento") the following Monday.  (PDF ¶ 11.)  Based on that advice,

15    plaintiff's mother took him to the Kaiser Sacramento mental health clinic on Monday, November

16    25, 2019.  (PDF ¶ 12.)  After evaluating plaintiff, a Kaiser Sacramento therapist placed plaintiff

17    on a waitlist for a mental health partial hospitalization program and advised his mother to call 911

18    if an emergency arose with respect to plaintiff's behavior.  (PDF ¶¶ 13–14.)

19            Between November 22 and 27, 2019, his mother gave plaintiff the prescribed Risperidone.

20    (PDF ¶ 15.)  On November 26, 2019, plaintiff had suicidal thoughts and attempted to hurt

21    himself, including by trying to grab knives, but his mother managed to stop him.  (PDF ¶¶ 16,

22    17.)  Around 2:30 a.m. on November 27, 2019, plaintiff's mother called a nurse from the Kaiser

23    psychiatry department because plaintiff was displaying manic and unusual behavior and was

24    unable to sleep.  (PDF ¶ 18.)  The Kaiser nurse informed plaintiff's mother that plaintiff needed

---

[2]  The relevant facts that follow are undisputed unless otherwise noted and are derived from the undisputed facts as stated by the moving defendants and responded to by plaintiff (Doc. No. 87-4 ("DUF")), the disputed facts as stated by plaintiff (Doc. No. 87-5 ("PDF")), as well as exhibits attached to the pending motion (Doc. No. 68-3).  Plaintiff characterizes his list of facts as being disputed; however, the moving defendants did not contradict or contest any of those facts in their reply brief, nor did they respond to plaintiff's statement of disputed facts.

1  additional treatment and medication and suggested she call 911 or visit the emergency room with

2  plaintiff in the morning.  (PDF ¶¶ 19–20.)

3         At approximately 9:40 a.m. on November 27, 2019, plaintiff's mother called 911 to

4  request assistance in taking plaintiff to the emergency room because his family was afraid to drive

5  him themselves.  (PDF ¶ 21.)  During the call, plaintiff's mother explained that he was having a

6  mental health crisis and needed an ambulance.  (PDF ¶¶ 22–23.)  The 911 dispatch replied that

7  the police would first come by to evaluate plaintiff.  (PDF ¶ 24.)  Subsequently, Roseville Police

8  Department ("RPD") officers arrived at plaintiff's family residence.  (PDF ¶ 25.)  Shortly after

9  their arrival, one of the officers asked plaintiff's mother to talk to him privately outside, and the

10  two made their way to the front door.  (PDF ¶ 26.)  Fearing separation from his mother, plaintiff

11  ran to close the door to stop them from going outside.  (PDF ¶ 27.)  Within seconds of plaintiff

12  closing the front door, an officer took plaintiff to the ground and held him down.  (PDF ¶ 28.)

13  The officers then restrained plaintiff with handcuffs and a WRAP device, and they removed him

14  from the residence and placed him in a police vehicle.  (PDF ¶¶ 30–32.)  Once in the vehicle, an

15  officer transported plaintiff to defendant SRMC for a medical clearance for jail.  (PDF ¶ 33; DUF

16  ¶ 1.)

17         An officer stayed at the scene to speak to plaintiff's parents.  (PDF ¶ 34.)  During their

18  conversation, plaintiff's parents discussed his recent mental health history, including his

19  psychosis, his prescription Risperidone medication, Kaiser insurance, and increasingly erratic and

20  paranoid behavior.  (PDF ¶ 35.)  They also informed the officer that plaintiff had made suicidal

21  statements.  (PDF ¶ 36.)  The officer told plaintiff's parents that plaintiff was being taken to

22  Kaiser for a 5150 mental health evaluation, leading plaintiff's mother to believe that plaintiff was

23  obtaining the mental health treatment he needed at Kaiser.  (PDF ¶¶ 37, 38.)  However, the police

24  vehicle instead took plaintiff to SRMC, and the RPD officers did not present plaintiff to SRMC

25  on a 5150 hold.  (PDF ¶¶ 40, 41.)

26         The police vehicle in which plaintiff was taken arrived at SRMC at 10:43 a.m.  (PDF

27  ¶ 40.)  Dr. Pilgrim, a physician at SRMC, agreed to perform the medical clearance for jail outside

28  the emergency department.  (PDF ¶ 48.)  At no point during his examination of plaintiff did Dr.

Pilgrim fear he was in any physical danger.  (PDF ¶ 49.)  Moreover, during plaintiff's time at SRMC, he displayed no aggression, made no threats, and showed no signs of anger.  (PDF ¶ 50.)  Nevertheless, while at SRMC, plaintiff was never taken out of the police vehicle, the WRAP, or the handcuffs.  (PDF at ¶¶ 44–46.)

Between 10:51 a.m. and 10:54 a.m., an SRMC nurse took plaintiff's vital signs (PDF ¶ 52), which indicated that plaintiff had an abnormal heart rate (tachycardia) of 125 beats per minute.  (DUF ¶ 15.)  Before exiting the hospital to approach the police vehicle, Dr. Pilgrim reviewed the vital signs obtained by the nurse and conducted a chart review of plaintiff's medical records at Sutter.  (PDF ¶ 54.)  However, during this review, no medical records for plaintiff could be located at Sutter.  (PDF ¶ 55.)

At 10:56 a.m., Dr. Pilgrim approached the RPD officers standing next to the police vehicle and spoke with them for approximately seven seconds.  (PDF ¶¶ 58, 59.)  During that conversation, officers informed Dr. Pilgrim that plaintiff was home from college when he started exhibiting some odd behavior and that plaintiff's parents called the RPD for a welfare check.  (PDF ¶¶ 59–60.)  The officers told Dr. Pilgrim that they had no further information about plaintiff's odd behavior or the need for a welfare check due to an altercation between them and plaintiff immediately upon their arrival at the family residence.  (PDF ¶ 62.)

According to the moving defendants, at around 10:58 a.m., Dr. Pilgrim assessed and physically examined plaintiff, but according to plaintiff's version of the events, Dr. Pilgrim began examining plaintiff at 10:56:19 a.m.  (DUF ¶ 4.)  Regardless, it is undisputed that at around 10:58 a.m., Dr. Pilgrim cleared plaintiff for incarceration and transportation to jail.  (DUF ¶ 18.)

Dr. Pilgrim typically conducts medical clearances for jail by reviewing records and talking with the patient to assess past medical history and potential injury risks, including asking the patient whether they have had thoughts of hurting themselves currently or in the past.  (PDF ¶¶ 70, 71, 73.)  During this evaluation, plaintiff stared blankly off and did not move, say anything, or make any noises.  (PDF ¶ 75.)  As a result, Dr. Pilgrim never obtained a medical history from plaintiff.  (PDF ¶ 67.)  Dr. Pilgrim's sole source of medical history was the police officers; Dr.
/////

1   Pilgrim did not consult with plaintiff's parents for any additional history.  (PDF ¶¶ 68, 69.)

2   Furthermore, Dr. Pilgrim did not ask plaintiff if he was suicidal.  (PDF ¶ 74.)

3   Because plaintiff was restrained in a WRAP in the back seat of the police vehicle, Dr.

4   Pilgrim was unable to conduct many of the standard tests for a medical clearance.  (PDF ¶ 78.)

5   Dr. Pilgrim observed that plaintiff was tachycardic, and he determined that plaintiff presented

6   symptoms that were consistent with agitation due to unclear reasons.  (DUF ¶¶ 15, 16.)  His

7   medical notes included mentions of "suspect drug abuse," "mental illness," and "psychiatric

8   disorder."  (Doc. No. 68-3 at 69, 70, 72.)   Despite this, Dr. Pilgrim did not refer plaintiff for a

9   mental health evaluation.  (PDF ¶ 83.)

10   Based on the information obtained from the police and Dr. Pilgrim's physical

11   examination, Dr. Pilgrim medically cleared plaintiff for jail.  (PDF ¶ 81.)  At 11:45 a.m., plaintiff

12   was transferred to the Placer County jail.  (DUF ¶ 19.)  While at the jail, plaintiff did not receive

13   any medications, and his mental health worsened.  (PDF ¶¶ 93, 94.)  While in jail on November

14   30, 2019—three days after being seen by Dr. Pilgrim at defendant SRMC—plaintiff removed his

15   right eye with his hands.  (DUF ¶ 21.)

16   **B.      Procedural Background**

17   On March 31, 2022, plaintiff filed his first amended complaint ("FAC"), which asserts

18   fourteen claims against forty-eight defendants.  (Doc. No. 51.)[3]  In his FAC, plaintiff asserts one

19   claim against the moving defendants for professional negligence under state law for allegedly

20   failing to properly evaluate and treat plaintiff on November 27, 2019.  (*Id*. at 55–58.)

21   On May 24, 2022, the moving defendants filed the pending motion for summary judgment

22   in their favor as to that sole claim against them for professional negligence.  (Doc. No. 68.)  In

23   support of their motion for summary judgment, the moving defendants filed an expert report from

24   William Whetstone, M.D., a physician who is board certified in emergency medicine.  (Doc. No.

25   68-4.)  After receiving an extension of time to file an opposition (Doc. No. 71), plaintiff timely

26

27   [3]  The court notes that plaintiff was granted leave to file a second amended complaint on August
     22, 2023 (Doc. No. 110 at 26), but plaintiff has yet to do so and the deadline for the filing of a
28   second amended complaint has not yet passed.

1    filed an opposition to the pending motion on August 16, 2022.  (Doc. No. 87.)  Concurrently,

2    plaintiff filed an expert report from Mark Langdorf, M.D., also a board-certified emergency

3    medicine physician, along with objections to the moving defendants' expert report.[4]  (Doc. Nos.

4    87-2, 87-3.)  On August 25, 2022, the moving defendants filed a reply in support of their motion

5    for summary judgment.  (Doc. No. 94.)

6    **C.      The Parties' Expert Reports**

7          The expert retained by the moving defendants, Dr. Whetstone, opines that the care

8    provided to plaintiff at SRMC on November 27, 2019 aligned with the standard of care and

9    neither caused nor contributed to plaintiff's injury.  (Doc. No. 68-4 at ¶ 6.)  Dr. Whetstone also

10   asserts that it was appropriate and not a breach of the standard of care for Dr. Pilgrim to clear

11   plaintiff for transfer to the jail in police custody because plaintiff did not have any injuries or any

12   medical condition requiring immediate medical attention at the hospital.  (*Id.* at ¶ 8.)[5]

13         In contrast, Dr. Langdorf, plaintiff's emergency medicine expert, opines that the care

14   provided to plaintiff at SRMC on November 27, 2019 fell short of both the general standard of

15   care for emergency medical providers and the specific standard for jail clearances.  (Doc. No. 87-

16   2 at ¶ 19.)  He highlights multiple instances where, in his judgment, Dr. Pilgrim deviated from the

17   standard of care.  (*Id.* at ¶ 19.)  These instances include:  failing to adequately evaluate plaintiff in

18   that he was never taken out of the police car, WRAP device, or handcuffs; neglecting to address

19   and stabilize plaintiff's tachycardia before clearing him for jail, despite indications of suspected

20   drug use; failing to obtain plaintiff's medical history despite reports of his odd behavior and the

21   fact that police were called to conduct a welfare check on him; neglecting the assessment of

22   ─────────────────

23   [4]  In connection with their opposition, plaintiff has raised objections to the expert report filed by
     the moving defendants based on the decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

24   509 U.S. 579 (1993).  (Doc. No. 87-3.)  For the reasons explained below, the court does not rely
     on the substance of Dr. Whetstone's expert report in resolving the pending motion.  Accordingly,

25   the court will overrule plaintiff's objections without prejudice to plaintiff raising them by way of
     a motion *in limine* prior to trial.

26
     [5]  A hospital is liable for a physician's malpractice when they are employed by or are the

27   ostensible agent of the hospital.  *Whitlow v. Rideout Mem'l Hosp.*, 237 Cal. App. 4th 631, 635
     (2015).  In their respective briefings, the parties appear to agree that Dr. Pilgrim was an employee

28   or ostensible agent of the hospital.  (*See* Doc. Nos. 68-1 at 12; 87 at 12 n.1.)

1   mental illness or self-harm risk particularly given that Dr. Pilgrim knew that police were called to

2   conduct a welfare check on plaintiff and that the officers were unable to complete the welfare

3   check due to an altercation between plaintiff and the police; and failing to reassess vital signs to

4   ensure normalization before clearing plaintiff for jail, given his tachycardia. (*Id.*) Dr. Langdorf's

5   perspective is that these deviations from the standard of care caused and contributed to plaintiff's

6   injury. (*Id.* at ¶ 20.)

### LEGAL STANDARD

8       Summary judgment is appropriate when the moving party "shows that there is no genuine

9   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10   Civ. P. 56(a).

11       In summary judgment practice, the moving party "initially bears the burden of proving the

12   absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

13   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party

14   may accomplish this by "citing to particular parts of materials in the record, including

15   depositions, documents, electronically stored information, affidavits or declarations, stipulations

16   (including those made for purposes of the motion only), admissions, interrogatory answers, or

17   other materials," or by showing that such materials "do not establish the absence or presence of a

18   genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

19   Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial,

20   "the moving party need only prove that there is an absence of evidence to support the non-moving

21   party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R.

22   Civ. P. 56(c)(1)(B). Indeed, after adequate time for discovery and upon motion, summary

23   judgment should be entered against a party who fails to make a showing sufficient to establish the

24   existence of an element essential to that party's case, and on which that party will bear the burden

25   of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an

26   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

27   *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as

28   */////*

1    whatever is before the district court demonstrates that the standard for the entry of summary

2    judgment . . . is satisfied." *Id.* at 323.

3          If the moving party meets its initial responsibility, the burden then shifts to the opposing

4    party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

5    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

6    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7    of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

8    admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

9    P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

10   (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

11   summary judgment.").  The opposing party must demonstrate that the fact in contention is

12   material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

13   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

14   non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

15         In the endeavor to establish the existence of a factual dispute, the opposing party need not

16   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

17   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

18   trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

19   Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in

20   order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations

21   omitted).

22         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

23   court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

24   *Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's

25   obligation to produce a factual predicate from which the inference may be drawn.  *See Richards*

26   *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th

27   Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

28   simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record

8

1   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

2   'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 586–87 (citations omitted).

3                                               **ANALYSIS**

4           Under California law, the elements for professional negligence, including medical

5   malpractice, that a plaintiff must prove are:  "(1) the duty of the professional to use such skill,

6   prudence, and diligence as other members of his profession commonly possess and exercise; (2)

7   breach of that duty; (3) a proximate causal connection between the negligent conduct and the

8   resulting injury; and (4) actual loss or damage resulting from the professional's negligence."

9   *Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (1999) (citation omitted).  "As a general rule, the

10  testimony of an expert witness is required in every professional negligence case to establish the

11  applicable standard of care, whether that standard was met or breached by the defendant, and

12  whether any negligence by the defendant caused the plaintiff's damages."  *Younan v. Rolls-Royce*

13  *Corp.,* No. 09-cv-02136-WQH-BGS, 2012 WL 2060869, at *6 (S.D. Cal. June 6, 2012) (quoting

14  *Scott v. Rayhrer*, 185 Cal. App. 4th 1535, 1542 (2010)); *see also Flowers v. Torrance Mem'l*

15  *Hosp. Med. Ctr.*, 8 Cal. 4th 992, 1001 (1994) ("[T]his court has on numerous occasions

16  articulated the general rule applicable in negligence cases arising out of the rendering of

17  professional services: The standard of care against which the acts of a physician are to be

18  measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a

19  malpractice action and can only be proved by their testimony, unless the conduct required by the

20  particular circumstances is within the common knowledge of the layman.") (cleaned up).

21          The moving defendants had initially moved for summary judgment in their favor

22  contending that Dr. Pilgrim did not breach the standard of care nor do anything to cause

23  plaintiff's injury.  However, in their reply, the moving defendants acknowledged that in opposing

24  their motion for summary judgment, plaintiff had established the existence of genuine disputes of

25  material fact related to the breach element, and thus they no longer seek summary judgment in

26  their favor based on that element.  (Doc. No. 94 at 2).  They do, however, continue to contend that

27  summary judgment in their favor should be granted based on the causation element because

28  plaintiff's self-inflicted act of removing his own eye constitutes a superseding cause, absolving

                                                    9

them of liability.  (*Id.*)  Plaintiff counters in his opposition that the evidence he submitted indicates that Dr. Pilgrim's breach was a substantial factor in causing injury to plaintiff, and that his action of pulling out his eye was not a superseding cause because it was foreseeable.  (Doc. No. 87 at 23, 24.)  Thus, the only question now before the court is whether, viewing the evidence in the light most favorable to plaintiff, there is a genuine dispute of material fact as to whether Dr. Pilgrim caused plaintiff's injury.

In a professional negligence claim, "causation requires proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff."  *Williams v. Wraxall*, 33 Cal. App. 4th 120, 132 (1995) (citations omitted); *see also Mosier v. Stonefield Josephson, Inc.*, 815 F.3d 1161, 1167 (9th Cir. 2016) (quoting *Williams* and stating that under California law, the substantial factor test determines causation with respect to a professional negligence claim); *Petteruti v. United States*, No. 00-cv-03230-VRW, 2003 WL 22461990, at *6 (N.D. Cal. Oct. 27, 2003) (stating that for a medical malpractice claim brought under California law, the "plaintiff must prove causation in fact, which means that she must present evidence that the defendant's negligent conduct was a 'substantial factor' in bringing about her injury"), *aff'd sub nom. Petteruti v. David Grant Med. Ctr.*, 120 F. App'x 117 (9th Cir. 2005).  "Evidence of causation must rise to the level of a reasonable probability based upon competent testimony."  *Williams*, 33 Cal. App. 4th at 133.

Here, to support his argument that Dr. Pilgrim's actions and inactions were a substantial factor in bringing about plaintiff's injury, plaintiff submits the expert declaration of Dr. Langdorf, who opines that the moving defendants' breach of their duty of care contributed to plaintiff's injury.  (Doc. No. 87-2 at ¶ 20.)  Specifically, Dr. Langdorf opines:

> Had Dr. Pilgrim and Sutter Roseville employees provided an appropriate [medical screening examination], Mr. Arceo would have been placed on a 1799 and/or 5150, given appropriate anti-psychotic medication, and/or been hospitalized.  Instead, Mr. Arceo was transported to jail where he did not get the necessary psychiatric care and treatment that he needed, resulting in an escalation of his psychiatric condition and the eventual removal of his own right eye.

(*Id.*)  The court finds that this opinion by plaintiff's medical expert creates triable issues of fact as

/////

10

1   to whether Dr. Pilgrim's actions and inactions proximately caused plaintiff's injuries.  This is not

2   the end of the court's inquiry, however.

3        The moving defendants also contend that even if Dr. Pilgrim's conduct was a substantial

4   contributing factor of plaintiff's harm, they are still not liable under California law if there was a

5   superseding cause "producing harm of a kind and degree so far beyond the risk the original

6   tortfeasor should have foreseen that the law deems it unfair to hold him responsible."  (Doc. No.

7   68-1 at 17) (quoting *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 573 n.9 (1994)).  The

8   superseding cause inquiry "revolves around a determination of whether the later cause of

9   independent origin, commonly referred to as an intervening cause, was foreseeable by the

10   defendant or, if not foreseeable, whether it caused injury of a type which was foreseeable." *Akins*

11   *v. Sonoma Cnty.,* 67 Cal. 2d 185, 199 (1967); *see also* Restatement (Second) of Torts § 442

12   (1965).  "If either of these questions is answered in the affirmative," the defendant remains liable.

13   *Akins*, 67 Cal. 2d at 199.  Typically, foreseeability is a question for the jury, unless "under the

14   undisputed facts there is no room for a reasonable difference of opinion." *Bigbee v. Pac. Tel. &*

15   *Tel. Co.*, 34 Cal. 3d 49, 56 (1983) (citation omitted); *see also Chanda v. Fed. Home Loans Corp.*,

16   215 Cal. App. 4th 746, 756 (2013) ("Whether an intervening force is superseding or not generally

17   presents a question of fact, but becomes a matter of law where only one reasonable conclusion

18   may be reached.").

19        Here, the moving defendants argue that "[t]here can be no doubt that Mr. Arceo's decision

20   to remove his own eye three days later was highly extraordinary.  Dr. Pilgrim simply could not

21   have foreseen such an act as a result of discharging Mr. Arceo into police custody rather than

22   keep him at the hospital for further observation or testing."  (Doc. No. 68-1 at 18.)  The court

23   finds this argument to be unpersuasive.  Plaintiff has introduced evidence that Dr. Pilgrim was

24   aware of plaintiff's recent displays of unusual behavior, the welfare check on plaintiff by police

25   requested by his parents, and plaintiff's subsequent altercation with police that prevented the

26   welfare check from being conducted.  Despite being privy to all of this information, Dr. Pilgrim

27   did not refer plaintiff for a mental health evaluation before clearing him for jail.  Additionally,

28   had Dr. Pilgrim pursued further inquiry, he would have discovered that plaintiff had made

11

suicidal statements and attempted to injure himself with knives the day prior to the medical evaluation.  Based on these actions and failure to act by Dr. Pilgrim, a reasonable juror could conclude that he initiated a sequence of events that he either knew or should have known would cause plaintiff significant harm.  *Shidler v. Cnty. of San Bernardino,* No. 19-cv-00503-ABS-HK, 2022 WL 2255005, at *10 (C.D. Cal. Mar. 7, 2022) ("Here, when viewing the facts in the light most favorable to Plaintiffs, Defendant has not shown that Decedent's suicide on March 27, 2018 was 'unforeseeable or extraordinary' considering that Decedent had expressed suicidal ideation on March 21, 2018 and based on this ideation was placed on suicide watch from March 21, 2018 through March 22, 2018.").  Even if it were shown that the specific way plaintiff was harmed—pulling out his own eye—was unforeseeable three days earlier, a juror could still reasonably conclude that Dr. Pilgrim's decision caused an injury of a foreseeable type:  self-harm.  *See Akins*, 67 Cal. 2d at 199 (noting that a superseding cause is a "later cause of independent origin" that was neither "foreseeable by the defendant" nor "caused injury *of a type* which was foreseeable") (emphasis added); *Pool v. City of Oakland*, 42 Cal. 3d 1051, 1064 (1986) ("[A] negligent defendant is liable for injuries brought about by an intervening cause of independent origin if the intervening cause was foreseeable by the defendant or, if not foreseeable, if it caused injury of a type which was foreseeable") (cleaned up).

There are genuine disputes of material fact that must be resolved by the finder of fact as to whether Dr. Pilgrim deviated from the standard of care in medically evaluating plaintiff and whether that breach caused plaintiff's injury.  Accordingly, plaintiff's professional negligence claim brought against defendants Sutter Health and SRMC survives summary judgment and the pending motion will be denied.

/////

/////

/////

/////

/////

/////

1        **CONCLUSION**

2        For the reasons explained above,

3        1.      Plaintiff's evidentiary objections to the moving defendants' expert report (Doc.

4                No. 87-3) are overruled without prejudice; and

5        2.      The motion for summary judgment filed by defendants Sutter Health and Sutter

6                Roseville Medical Center (Doc. No. 68) is denied.

7        IT IS SO ORDERED.

8  Dated:   __**August 30, 2023**__                    _____

9                                                        UNITED STATES DISTRICT JUDGE